UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DEBRA OLAYER GUTIERREZ,<br>Plaintiff,<br>v.<br>COMMISSIONER OF SOCIAL SECURITY,<br>Defendant. | Case No. 18-cv-02348-RMI<br><br>**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**<br>Re: Dkt. Nos. 13, 18 |

Plaintiff, Debra Olayer Gutierrez seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 8), and both parties have moved for summary judgment (dkts. 13 & 18). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Substantial evidence is "more than a mere scintilla but less than a preponderance; it is such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Sandgathe v. Chater*, 108 F.3d 978, 979 (9th Cir. 1997). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On June 18, 2014, Plaintiff filed an application for disability insurance benefits under Title II, alleging disability beginning on April 1, 2012. *See Administrative Record "AR"* at 12.[1] The ALJ denied the application on December 28, 2016. *Id*. at 20. The Appeals Council denied Plaintiff's request for review on February 15, 2018. *Id*. at 1-3.

## SUMMARY OF THE RELEVANT EVIDENCE

Plaintiff's application for Title II benefits alleged disability due to anxiety, major depression, post-traumatic stress disorder, bipolar disorder, migraines, and back problems. Pl.'s Mot. (dkt. 13) at 5. The ALJ found the following conditions were severe: "very mild degenerative joint disease of the right knee; headaches; major depressive disorder; and generalized anxiety disorder." *AR* at 14. In this court, Plaintiff assigns error to the ALJ's formulation of the Residual Functioning Capacity ("RFC"), arguing that the RFC failed to adequately account for Plaintiff's physical and mental limitations; as well as arguing that the ALJ's Step Five determination was unsupported by substantial evidence. *See* Pl.'s Mot. (dkt. 13) at 5.

*Medical Evidence from Treatment Providers:*

By way of background, Plaintiff, who was born in 1960, worked for AT&T for 30 years; after battling depression and anxiety for years, Plaintiff stopped working in 2012 due to being overwhelmed by her conditions. *See AR* at 367. Plaintiff was a patient of Maria Escalda, M.D., since September of 1999. *Id.* at 324. Over the years, Dr. Escalda submitted at least four letters to

---

[1] The AR that pertains to this appeal is filed at docket 12. Another AR, belonging to a different appeal, was incorrectly filed in this matter at docket 17.

Plaintiff's former employer to justify time off, expressing her opinions regarding Plaintiff's mental health, and describing "a long history of anxiety and depression . . . [as well as] migraine headaches . . . hindering [] her concentration, comprehension, attention, decision making as well as sleep." *AR* at 324-25. Writing in March of 2010, Dr. Escalda noted that Plaintiff had been diagnosed with major depression, bipolar disorder, insomnia, as well as a thyroid imbalance, and that these conditions caused her to suffer sleeplessness, weakness, dizziness, fatigue, nervousness, and migraine headaches. *Id*. at 308. Writing again, in May of 2011, Dr. Escalda noted that Plaintiff was "unable to perform her work duties due to constant symptoms of major depression, anxieties, panic attacks, low energy, shakiness, dizziness, fatigue, headache," and an inability "to concentrate / focus / mak[e] decisions." *Id*. at 305. Plaintiff's diagnoses were consistent with those made by Alysha Zim, M.D., nearly a decade earlier, as reflected in a similar letter to Plaintiff's employer at the time. *Id*. at 336. Plaintiff's psychotherapist, Francis Verala, Ph.D., also wrote several similar letters to Plaintiff's former employer, explaining that Plaintiff had been his patient since 2006, and similarly relating the narrative of Plaintiff's metal impairments and their effect on her ability to work. *Id*. at 339-42.

Of greater relevance to the relevant disability timeframe (starting on April 1, 2012) are the records of Plaintiff's psychiatrist, Alfeo Reminajes, M.D., who treated Plaintiff from 2011 to 2016. *See id*. at 357, 362, 427-35, 443-48, 503-06. Plaintiff first visited Dr. Reminajes in May of 2011, seeking a psychiatric evaluation and a treatment plan. *Id*. at 443. As part of Plaintiff's initial psychiatric evaluation, Dr. Reminajes identified an exacerbating trigger of Plaintiff's problems with anxiety and depression as happening in 2006 when she became embroiled in protracted conflict with a co-worker and supervisors at work. *Id*. Specifically, Dr. Reminajes noted that in 2006 Plaintiff had confided some dark thoughts to a co-worker and friend (that a certain supervisor should be "eliminated") who promptly reported the conversation to management; and that since then, Plaintiff has experienced a "history of mood problems." *Id*. Dr. Reminajes wrote that in 2011 Plaintiff was still experiencing panic attacks "on almost a daily basis," as well as suffering from low energy and motivation levels, suffering bouts of irritability and outbursts of anger, as well as "intermittent suicidal thoughts but no definite plans." *Id*. Dr. Reminajes also

3

noted "[p]aranoid ideations . . . [s]he is scared to go out in public . . . [and] thinks that someone is watching her and spying [on] her." *AR* at 446. Based on Plaintiff's 2011 psychiatric evaluation, Dr. Reminajes made an Axis-I diagnoses of major depressive disorder and PTSD; and opined that Plaintiff needed regular psychotherapy to further the objective of controlling her depression, anxiety, and PTSD symptoms. *Id*. at 446-48.

Having evaluated and treated Plaintiff, Dr. Reminajes completed and submitted two separate mental capacity forms describing her limitations, one in July of 2014, and the other in April of 2015. *Id*. at 427-35, 503-06. In July of 2014, Dr. Reminajes opined that Plaintiff would have intermittent difficulty performing in the following areas: understanding, remembering, or executing detailed instructions; maintaining attention for extended periods; attendance, punctuality, and performing within a schedule; sustaining an ordinary routine without supervision; completing a normal workday or workweek without interruptions from psychologically based symptoms; receiving instructions and responding to criticism from supervisors; the ability to respond to changes in the workplace; and, lastly, that Plaintiff could be expected, due to her conditions, to be absent from work 2 days per month. *Id*. at 432-35. Dr. Reminajes also noted that Plaintiff's anxiety was manifesting itself in, among other ways, Plaintiff pulling out her hair. *Id*. at 435. In April of 2015, Dr. Reminajes found that Plaintiff's conditions had worsened. *Id*. at 427-31. Where Plaintiff's difficulties were described in 2014 as "intermittent," Plaintiff's functionality in a number of those areas changed, and was described in 2015 as "seriously limited." *Id*. at 427-31. As to the ability to respond appropriately to changes in the work setting, Dr. Reminajes's 2015 assessment found that Plaintiff's "ability to function in this regard is precluded." *Id*. at 430.

For her headaches, Plaintiff was referred to a neurologist, Bradley Wrubel, M.D., in 2015. *Id*. at 458-60. Dr. Wrubel noted Plaintiff's history of chronic daily headaches which are "associated with nausea, photophobia, and phonophobia." *Id*. at 458. Noting Plaintiff's abnormal fatigue and her memory disturbance, Dr. Wrubel assessed that Plaintiff "does have chronic and daily mild headaches with weekly exacerbations," for which he formulated a treatment plan including medical intervention and nutritional changes. *Id*. at 459-60.

Between April of 2014 and October of 2016, Plaintiff underwent at least 39 therapy

sessions with Billie Warden, LMFT, who noted Plaintiff's "depressed mood, excessive guilt, social isolation, decreased energy, disordered sleep patterns, increased irritability, and difficulty focusing and concentrating."[2] *AR* at 550. Therapist Warden administered the Beck Depression Inventory (DBI)[3] and determined that Plaintiff's depression was extremely severe. As to Plaintiff's anxiety, Therapist Warden noted the anxiety causes panic attacks during which Plaintiff feels shaky, experiences shortness of breath and heart palpitations; seeking relief from these anxiety symptoms, Plaintiff had been chronically pulling out her hair because it was associated with a perception of relief. *Id*. Therapist Warden then noted that since having both experienced and witnessed both physical and verbal abuse as a child, Plaintiff "can become triggered by witnessing or learning of verbal and/or physical abuse experienced by someone close to her . . . [and] when triggered she has intrusive distressing memories and dreams, and feels intense anger." *Id*. In short, Therapist Warden diagnosed Plaintiff with major depressive disorder, panic disorder, post-traumatic stress disorder, and trichotillomania[4]; thus, Therapist Warden noted that "[d]espite the fact that Plaintiff has been taking psychotropic medications, she continues to experience debilitating depression and anxiety which prevent her from being able to be employed." *AR* at 550-51. Additionally, Therapist Warden's handwritten notes from each of the nearly 40 sessions

---

[2] The ALJ "assign[ed] little weight" to Therapist Warden's opinions "because Ms. Warden is not an acceptable medical source and her conclusory statement is inconsistent with the relative absence of specialized psychiatric treatment, and with the Global Assessment of Functioning (GAF) scores of 60 to 65 assigned by the psychiatrists and other licensed processionals." *Id*. at 15. The acronym, LMFT, stands for Licensed Marriage and Family Therapist, which is a professional discipline with graduate and post graduate programs. It should be mentioned that certain branches of the federal government have come to accept LMFT providers as "core mental health" professionals along with psychiatrists, psychologists, social workers, and psychiatric nurses. *See e.g.*, 42 C.F.R. § 5, App. C. Pt. 5, § (B)(3)(b)(i) (the Health Resources Services Administration defines marriage and family therapists as "core mental health professionals"); *see also* 38 U.S.C. § 7402(b)(10) (approving LMFT providers in the Veterans Administration health care system); *see also* 10 U.S.C. § 1094(e)(2) (the Department of Defense definition of "health care professional" includes marriage and family therapists).

[3] The BDI is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression. *See* website of the American Psychological Association: https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessment/tools/beck-depression (last visited 09/05/2019 at 1:00 pm).

[4] Trichotillomania, also called hair-pulling disorder, is a mental disorder in the broader category of obsessive-compulsive disorders that involves recurrent, irresistible urges to pull out hair from your scalp, eyebrows or other areas of your body, despite trying to stop. *See* DSM-5 (Diagnostic and Statistical Manual of Mental Disorders, 5th ed.) at 312.39.

5

of therapy were included as part of the record before the ALJ. *See AR* at 520-47.

In October of 2016, Plaintiff was treated by Christine Simon, M.D., who noted that Plaintiff was taking medications for her major depressive disorder, PTSD, anxiety disorder, insomnia, and migraine headaches and that the combination of her "[m]ental problems and her medications cause fatigue and trouble focusing," *Id.* at 502. Also in October of 2016, Plaintiff transferred her psychiatric care to Simrita Singh, M.D., who wrote that Plaintiff has "a long history of depression and early childhood trauma that has caused PTSD" and that Plaintiff had "struggled with symptoms for years while she was employed and progressively got worse until she could no longer function in the workplace in 2012." *Id*. at 45. In October of 2016, as part of Plaintiff's initial evaluation, Dr. Singh noted that Plaintiff's mood issues and suicidal thoughts for the duration of her life had roots in childhood trauma, and that Plaintiff "feels dysfunction followed her everywhere." *Id*. at 48. During the mental status examinations conducted by Dr. Singh in January and March of 2017, Plaintiff's affect was noted as being both constricted (a restriction in the range or intensity of feelings) as well as labile (expressing excess emotions or emotions not congruent with the situation); Plaintiff's thought process was found to be circumstantial (answering questions with excessive unnecessary detail) and rambling; Plaintiff's thought content was found to be marked by negative and circular (rather than linear) thoughts; and, as to attention and memory, Plaintiff was found to have a diminished attention and focus, as well as a poor recall of details. *Id*. at 46-48, 51. When delving into Plaintiff's history of past trauma, Dr. Singh noted a number of instances of verbal abuse and neglect, as well as instances of physical abuse and rape. *Id*. at 50. Dr. Singh diagnosed Plaintiff with major depressive disorder and PTSD and noted that Plaintiff had "been in psychiatric treatment with medications and weekly psychotherapy ever since with very little improvement in her symptoms." *Id*. at 45. Consequently, because of Plaintiff's "lengthy history of untreated symptoms" followed by the "lack of improvement once treatment did start," Dr. Singh opined in March of 2017 that Plaintiff "is unlikely to improve to the point of resuming any gainful employment at this point." *Id*.

*Reports of Consultant Examiners:*

On September 17, 2014, Plaintiff underwent two one-time examinations by consulting

6

professionals at the request of the Department of Social Services; the first was an internal medicine evaluation and was performed by Eugene McMillan, M.D.; the second was performed by Ute Kollath, Ph.D., and was a mental status evaluation. *AR* at 363-70. Dr. McMillan found that Plaintiff had some patellar grinding in her right knee, and that although "[t]here is some evidence of degenerative disc disease involving the right patellar region," Plaintiff's functional capacity assessment was that she could "occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds . . . [s]tanding and walking [] for at least six hours during an eight-hour workday . . ." with no limitations expressed as to any of the above-mentioned mental conditions. *Id*. at 366. Dr. Kollath only diagnosed Plaintiff with anxiety disorder, and then offered an opinion as to her work-related abilities, "from a psychological standpoint alone," finding Plaintiff to be mildly impaired in the following areas: adequately performing complex tasks, maintaining adequate attention/concentration, withstanding the stress of a routine workday, and adapting to changes, hazards, or stressors in the workplace setting. *Id*. at 370.

*Function Reports & Third Party Statements:*

Plaintiff submitted a function report, as well as a completed questionnaire focused on symptoms of depression with appears to be the BDI administered by Therapist Warden. *Id*. at 228-36, 548-49. By way of her responses to the questionnaire, Plaintiff related that she is sad all the time and is unable to snap out of it; that looking back on her life, she can see nothing but failures; that she is riddled with feelings of guilt, shame, unattractiveness and irritability; that she has had thoughts of killing herself which she would then not carry out; that she gets tired doing almost anything, and has difficulty with sleeping and making decisions; and lastly, Plaintiff feels that she is being punished for her weaknesses and mistakes. *Id*. at 548-49. Plaintiff's function report describes her ability to work as being limited by her constant daily dizziness, fatigue, migraines, deficits in concentration and understanding, as well as her anxiety, PTSD, and her thoughts of harming herself and others. *Id*. at 228. A typical day in Plaintiff's life involves, with the aid of her teenage daughter, waking up with a migraine, massaging her head to abate the pain, taking medication and spending the majority of the rest of the day laying down and taking naps due to dizziness and fatigue. *Id*. at 229. The extent of Plaintiff's other activities is limited to doing

7

laundry once a week, leaving her home no more than twice a week, and going shopping once a month. *AR* at 230-31. Plaintiff also related that she has a short temper around family and friends who either do not understand her or do not listen to her, while at the same time fearing the prospect of being around strangers. *Id*. at 233. In response to the function report's question about noticing any unusual fears, Plaintiff responded that, among other things, she fears her suicidal thoughts. *Id*. at 234.

One of Plaintiff's daughters, V.G., submitted a third-party function report in which she described the effects of her mother's headaches, anxiety, fatigue, low self-esteem, and suicidal thoughts as resulting in Plaintiff isolating herself due to the anxiety, and, generally struggling due to her difficulties with understanding instructions, concentrating, or completing tasks. *Id*. at 237, 242-43. Plaintiff's other daughter, M.G., who lives with Plaintiff, also submitted a letter for the ALJ's consideration, stating at the outset that "[m]y mom has major depression and severe anxiety, which causes her to have insomnia, migraines, and thoughts of suicide." *Id*. at 297-98. Describing Plaintiff's persistent insomnia for which she takes sleeping pills, a remedy "that doesn't even work many times," Plaintiff's daughter states that "[t]here have been numerous occasions that she was so drugged up on sleeping pills that she missed significant events" such as Thanksgiving or Christmas. *Id*. at 297. Regarding Plaintiff's anxiety, her daughter notes that "[m]y mom experiences such anxiety that prevents her from doing simple tasks such as a three mile drive . . . [and the] anxiety leads to migraines and disables her from functioning . . . [because] [s]he is nervous all the time and has chest pain, panic attacks and migraine[s]." *Id*. at 298. Plaintiff's daughter concluded her letter to the ALJ by opining that "[m]y mom is not in a good state of mind to be in a demanding and stressful situation[]" . . . [because] [s]he may harm herself or others . . . [and] often express[es] [that] she want[s] to end it all and could no longer handle people." *Id*.

*Hearing Testimony:*

The hearing began with the ALJ asking Plaintiff why she stopped working, to which Plaintiff responded as such: "I was falling apart. My stress level, and my depression, my anxiety. I was just losing myself . . . I couldn't deal with my frame of mind, the level of anxiety, the energy, forcing myself to go to work, having to sleep in between every hour. I couldn't do it anymore." *Id*.

8

at 31. Following a few general questions about Plaintiff's migraines, sleep problems, and fatigue, the ALJ asked the Vocational Expert ("VE") to opine as to an equivalent position to Plaintiff's prior employment as a project manager for AT&T, to which the VE responded by suggesting telephone sales representative. *AR* at 32-40. The hearing was then adjourned after counsel, through the closing remark, reminded the ALJ that "[t]his is primarily a psychological case." *Id*. at 43.

*The ALJ Decision:*

On this record, the ALJ found that Plaintiff retained the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), "except that she can frequently balance, stoop, kneel, crouch, and crawl; frequently climb ramps, stairs, ladders, ropes, and scaffolds; [but that] she should avoid concentrated exposure to extreme heat and extreme cold; and she is limited to simple, unskilled work . . . that needs little to no judgment to perform simple duties." *Id*. at 17. The decision characterized the above-described record as "show[ing] minimal treatment and Global Assessment of Functioning (GAF) scores consistent with mild to moderate impairment." *Id*. at 18. In short, the ALJ's formulation of the RFC without any limitations addressing Plaintiff's psychiatric and psychological impairments was premised on the ALJ's conclusion that "claimant's mental health records are inconsistent with disability because they show treatment primarily from a family therapist, with only four specialized psychiatric appointments showing GAF scores of 60 during the relevant period." *Id*. at 16.

## THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[5] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled. *See id*. §

---

[5] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

416.920. "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step sequential evaluation. *AR* at 12-20. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 14.

At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: very mild degenerative joint disease of the right knee; headaches; major depressive disorder; and generalized anxiety disorder. *AR* at 14.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's RFC and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. *AR* at 15-17. Next, the ALJ determined that Plaintiff retained the RFC to perform unskilled medium work with the limitations described above. *AR* at 17-19.

At Step Four, the ALJ determined that Plaintiff is not capable of performing her past relevant work as a project manager for a telecommunications company because she is limited to simple unskilled work that requires little to no judgment to perform simple duties. *Id*. at 19.

10

At Step Five, the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, considering the claimant's residual functional capacity, age, education, and work experience. *See* 20 CFR § 404.1560(b)(3). This burden can be satisfied in one of two ways, either "by the testimony of a vocational expert, or [] by reference to the Medical-Vocational Guidelines [found] at 20 C.F.R. pt. 404, subpt. P, app. 2." *Tackett v. Apfel*, 180 F.3d 1094, 1100-01 (9th Cir. 1999). Here, the ALJ concluded that based on the RFC for unskilled medium work with minor limitations, Plaintiff was not disabled under an application of the Medical Vocational Rules, and thus, a non-disability finding was entered because "claimant's limitation to frequent postural activities would not be anticipated to significantly erode the availability of work at the medium exertional capacity." *AR* at 19, 20. Accordingly, the ALJ found that Plaintiff had not been under a disability, as defined in the Social Security Act, from April 1, 2012, through the date of the issuance of the ALJ's decision, December 28, 2016. *Id*. at 20.

**ISSUESS PRESENTED**

Plaintiff presents three issues for review, claiming that: the RFC was not supported by substantial evidence because the ALJ failed to take adequate account of the mental impairment evidence; the RFC was unsupported by substantial evidence when the ALJ failed to take adequate account of Plaintiff's knee impairment or to inquire into Plaintiff's physical capacity in this regard; and the ALJ's Step Five determination was erroneous because of the ALJ's finding that the additional RFC limitations have little or no effect on the occupational base of unskilled medium work. *See* Pl.'s Mot. (dkt. 13) at 3, 15-26.

**DISCUSSION**

Plaintiff argues that the RFC in this case made inadequate allowances for Plaintiff's mental impairments, reflecting a wholesale rejection of the virtual entirety of the mental health evidence in the record; or, as the ALJ put it, "Claimant's mental health records are inconsistent with disability." *AR* at 15. First, the ALJ noted that Plaintiff received "no specific treatment for mental impairments" between March of 2012 and April of 2013, and that Plaintiff's therapist, Billie Warden, LMFT, "is not an acceptable medical source." *Id*. Second, the ALJ explained that the

11

"mental health records are inconsistent with disability because they show treatment primarily from a family therapist, with only four specialized psychiatric appointments showing GAF scores of 60 during the relevant period. I note these GAF scores are consistent with mild to moderate impairment. Therefore, I find claimant has no more than moderate limitation in any of the mental domains." *Id*. at 16.

Plaintiff contends that the ALJ erred in evaluating the medical evidence by failing to adhere to judicially established standards for accepting or rejecting medical evidence and medical opinions from treating and examining sources. Pl.'s Mot. (dkt. 13) at 23-26. Defendant responds that under regulations applicable at the time of the ALJ's decision in this case, licensed family and marriage therapists were considered "other sources," who may provide evidence in consideration of a disability claim, and whose opinions could be rejected by an ALJ merely by providing germane reasons as to that witness. Def.'s Mot. (dkt. 18) at 13. Defendant adds that those regulations have since been updated, and that the acceptable medical source evaluation has undergone some unspecified degree of change. *Id*. The remainder of Defendant's arguments in this regard appear to constitute a series of *post hoc* justifications for the ALJ's rejection of the entirety of Plaintiff's mental health evidence (medical evidence, opinions of treating physicians, and lay testimony) in favor of Dr. Kollath's more limited set of opinions which were based on a one-time consulting psychological examination. *Id*. at 9-13.

### *The Treating Physicians*

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant . . . [T]he Commissioner must provide clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician . . . [T]he opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons . . ." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1222 (9th Cir. 2010) (quoting *Lester v. Chater*, 81 F.3d 821, 830-31 (9th Cir. 1995). The reason that an ALJ must accord special weight to a treating physician's opinion is that a treating physician "is employed to cure and has a greater opportunity to know and observe the patient as an individual." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted). If a treating source's

12

opinions on the issues of the nature and severity of a claimant's impairments are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and are not inconsistent with other substantial evidence in the case record, the ALJ must give it "controlling weight." 20 C.F.R. §§ 404.1527(c)(2), 416.927(d)(2).

As stated, if a treating physician's opinion is not contradicted by another physician, it may be rejected only for "clear and convincing" reasons. *Lester*, 81 F.3d at 830. However, if the treating physician's opinion is contradicted by another physician, such as an examining physician, the ALJ may reject the treating physician's opinion by providing specific, legitimate reasons, supported by substantial evidence in the record. *Id.* at 830-31; *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Where a treating physician's opinion is contradicted by an examining professional's opinion, the Commissioner may resolve the conflict by relying on the examining physician's opinion if the examining physician's opinion is supported by different, independent clinical findings. *See Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995); *Orn*, 495 F.3d at 632; *see also Bayliss*, 427 F.3d at 1216 (if an examining physician's opinion is contradicted by another physician's opinion, an ALJ must provide specific and legitimate reasons to reject it). However, for present purposes, it is important to note that "[t]he opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician" — such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record. *Lester*, 81 F.3d at 830-31; *Morgan v. Comm'r of Soc. Sec.*, 169 F.3d 595, 600 (9th Cir. 1999).

Plaintiff has presented medical evidence showing consistent treatment for her mental impairments for two decades, including records from Dr. Escalda, who had been treating her since 1999, and who described Plaintiff's "long history" of anxiety, depression, migraine headaches, and insomnia, as well as the consequential deficits in her concentration, comprehension, attention, and decision-making. *AR* at 324-25. As described in detail above, Dr. Escalda's findings were consistent with those of Plaintiff's other treating physicians and mental health professionals, namely, Dr. Zim (*id*. at 336), Dr. Verala (*id*. at 339-42), Dr. Reminajes (*id*. at 357, 362, 427-35,

13

443-48, 503-06), Dr. Singh (*id*. at 46-50), Dr. Wrubel (*id*. at 458-60), Dr. Simon (*id*. at 502), and LMFT Warden (*id*. at 520-47).

Most notably, Plaintiff's treating psychiatrist, Dr. Reminajes opined in 2015 that Plaintiff's anxiety was manifesting itself, among other ways, in Plaintiff pulling out her hair. *AR* at 432-35. Because her condition had worsened, Dr. Reminajes found that Plaintiff suffers from a work-preclusive inability to respond appropriately to changes in the work setting. *AR* at 430, 432-35. Similarly, after nearly 40 separate therapy sessions over the span of two years, Therapist Warden found that Plaintiff's major depressive disorder, panic disorder, post-traumatic stress disorder, trichotillomania, and the fact that psychotropic medications do not abate her "debilitating depression and anxiety," all combine to "prevent her from being able to be employed." *AR* at 550-51. Likewise, Plaintiff's subsequent psychiatrist, Dr. Singh, also concluded that, due to Plaintiff's lengthy history of untreated symptoms followed by the "lack of improvement once treatment did start, Plaintiff is unlikely to improve to the point of resuming any gainful employment at this point." *AR* at 45.

Accordingly, in light of the record, the court finds that the ALJ should have either given controlling weight to the opinions of Plaintiff's treating physicians and found Plaintiff to be disabled or to formulate a RFC that would be harmonious with these opinions; or, to have given clear and convincing reasons for rejecting any un-contradicted portions of the opinions while giving specific and legitimate reasons for rejecting any contradicted portion of the opinions. Because none of the explanations found in the ALJ's decision approach this court's conception of legitimate or convincing reasoning for the rejection of Plaintiff's treatment providers' opinions, the court finds that the ALJ erred and the case is properly remanded for further proceedings consistent with the guidance provided herein.

### *Plaintiff's and Lay Witness Testimony*

"[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). Here, the ALJ made no substantial mention of the evidence presented in Plaintiff's

testimony, the above-discussed questionnaire, or Plaintiff's function report, other than to reiterate the frequently-used boilerplate statement that "claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." *AR* at 18. This particular boilerplate has been the subject of criticism for some time. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) ("In *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), we called this 'meaningless boilerplate. The statement by a trier of fact that a witness's testimony is 'not entirely credible' yields no clue to what weight the trier of fact gave the testimony.'"). To undermine Plaintiff's credibility as to her insomnia and headaches, the ALJ seems to rely almost exclusively on Plaintiff's GAF scores even though "GAF scores are typically assessed in controlled, clinical settings that may differ from work environments in important respects." *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014). The ALJ does not provide any reasons why Plaintiff's testimony regarding her PTSD, anxiety disorder, panic attacks, and major depression are incredible.[6] Thus, the court finds that the ALJ failed to meet the clear and convincing standard for rejecting Plaintiff's testimony.

Further, to discredit the testimony of lay witnesses, an ALJ must give reasons that are germane to that witness. *See Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (citing *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001)). The ALJ erred when he failed to mention, let alone discuss reasons for rejecting, the testimonial evidence provided by Plaintiff's two daughters in the form of a function report and a letter. *See e.g. Bagdoyan v. Colvin*, No. CV 12-5312 RNB, 2013 WL 941965, at *4 (C.D. Cal. Mar. 11, 2013) ("The law is well-established in this Circuit that lay witness testimony as to how a claimant's symptoms affect the claimant's ability to work is competent evidence and cannot be disregarded without providing specific reasons germane to the testimony rejected.").

The picture painted by the totality of the evidence in this case is one of a long suffering

---

[6] The ALJ does state that Plaintiff's testimony is inconsistent with "her mental health treatment records, discussed under Finding 4," wherein the ALJ rejected the opinions of Plaintiff's various treating physicians. *AR* at 18. However, as discussed supra, that rejection was error.

15

individual, a traumatized person who has been the victim of sexual violence and other abuse, and of a person who lived and worked through her depression, anxiety, and PTSD as long as she could, until it finally overwhelmed her and she simply could no longer work. Plaintiff's account, in her own words, in her daughters' words, and in the findings and opinions of her many treating physicians is harmonious and consistent, leaving no room for its wholesale rejection by the ALJ in formulating an RFC that took no account of Plaintiff's mental and emotional limitations. The ALJ placed great reliance on a finding that, during one or another eleven-month period, Plaintiff was either not receiving treatment that was sufficiently "specialized" or receiving treatment that somehow doesn't count because it came in the form of therapy sessions from a LFMT provider. The courts do not take such a myopic view of treatment. "[I]t is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment. Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." *Garrison*, 759 F.3d at 1017. Accordingly, the court finds that the ALJ improperly evaluated and improperly discredited Plaintiff's testimony and all of the lay witness evidence relating to Plaintiff's mental impairments.

### *Step II Error*

The court will also note that Plaintiff's PTSD was omitted entirely from the ALJ's Step-II discussion. It simply was not mentioned. On remand, Defendant is reminded of its obligation to take reasonable steps to ensure that issues and questions raised by medical evidence, particularly evidence from treating physicians, are properly addressed so that the disability determination is fairly made on a sufficient record of information, be it favorable or unfavorable to the claimant. *See Tidwell v. Apfel*, 161 F.3d 599, 602 (9th Cir. 1999); and, *Cox v. Califano*, 587 F.2d 988, 991 (9th Cir. 1978); *see also* 42 U.S.C. § 421(h). The responsibility to fulfill this duty belongs entirely to the ALJ; it is not part of the claimant's burden. *See e.g., White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) ("This duty extends to the represented as well as to the unrepresented claimant . . . The ALJ's duty to develop

the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests. Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an appropriate inquiry . . . including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record.").

*Other Issues Presented*

Lastly, because the court is already remanding the case for further proceedings, the court does not find it necessary to address Plaintiff's remaining two issues (a second assertion of error in the formulation of the RFC, and a subsequently occurring Step-5 error) because both claims can be adequately addressed on remand, and because neither can secure for Plaintiff any relief beyond what is already being granted. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir. 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach [plaintiff's] alternative ground for remand."); *see also Abdul-Ali v. Berryhill*, No. 18-cv-03615-RMI, 2019 WL 3841995, at *7 (N.D. Cal. Aug. 15, 2019); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008) ("[The] Court need not address the other claims plaintiff raises, none of which would provide plaintiff with any further relief than granted, and all of which can be addressed on remand.").

**CONCLUSION**

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 13) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 18) is **DENIED**. The case is remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 25, 2019

ROBERT M. ILLMAN
United States Magistrate Judge